BROWN | POORE LLP
Scott A. Brown (SBN 177099)
David M. Poore (SBN 192541)
1350 Treat Boulevard, Suite 420
Walnut Creek, California 94597
Telephone: (925) 943-1166
Facsimile: (925) 955-8600
sbrown@bplegalgroup.com

Attorneys for Plaintiff MICHAEL SIBBITT, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SIBBITT, JR. | **Case No.** |
| Plaintiff, | **COMPLAINT** |
| v. | **VIOLATION OF 31 U.S.C. §3730(h);** <br> **VIOLATION OF 42 U.S.C. §1983** |
| CITY OF PITTSBURG; BRIAN ADDINGTON; MICHAEL PERRY and DOES 1-25, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Michael Sibbitt, Jr. complains and alleges as follows:

## I. INTRODUCTION

1. This is a case involving whistleblower retaliation and civil rights claims related to Plaintiff's wrongful termination by the City of Pittsburg's Police Department ("Defendant" or "Pittsburg"). Plaintiff seeks back pay and front pay, along with interest, compensatory damages for emotional distress arising from Pittsburg's treatment of him, attorneys' fees and costs, penalties, treble damages, and all other relief, including declaratory and injunctive relief, available under the law.

2. Plaintiff's claims stem from a clear sequence of events culminating in his unlawful termination. Plaintiff learned that the Pittsburg's Police Department was instructing him and its officers to falsify crime reports, refrain from documenting use of force, and submit police reports for lower crime classifications to result in the appearance of lower crime statistics in the City of Pittsburg.

3. Plaintiff informed Defendants that there were serious problems with its Department's policy of reporting crime and also reported these fraudulent policies to outside government agencies such as the Contra Costa County Sheriff's Department.

4. Defendants proceeded to retaliate against him for complaining about these procedures and reporting these complaints by accusing him of undefined "alleged misconduct", conducting an Internal Affairs investigation without interviewing him and other knowledgeable witnesses, and threatening criminal prosecution if he did not resign from the Department, and denying him other rights under the Peace Officer's Bill of Rights. Defendant's threats and actions resulted in Plaintiff's constructive termination.

5. During his employment with the Pittsburg Police Department, Plaintiff was a successful police officer. His performance reviews were excellent, his work ethic was lauded, and he received commendations. Prior to his employment with the City of Pittsburg, Plaintiff served six years as a deputy sheriff with the Contra Costa County Sheriff's Department.

6. The purported basis for Plaintiff's termination was an obvious pretext for Plaintiff exercising his rights of free speech and association, as well as his whistleblowing activities, and

2
MICHAEL SIBBETT, JR. v. CITY OF PITTSBURG, ET AL.
COMPLAINT

1  was false and injured his personal, business, and professional reputation.  Defendants continue to
2  sabotage Plaintiff's ability to seek employment in law enforcement by misrepresenting his
3  background and reason for termination to prospective employers.

## II. PARTIES

7. Plaintiff Michael Sibbitt is an individual over the age of 18 and, at all relevant times was an employee of Defendant City of Pittsburg from September 2012 through August 2014.

8. Plaintiff is informed and believes, and on that basis alleges, Defendant City of Pittsburg is and at all times mentioned herein an entity of the State of California with its principal place of business in Pittsburg, California.  Plaintiff is informed and believes, and on that basis alleges, that City of Pittsburg, was authorized to operate and do business in this judicial district in the State of California.  Defendant is, and at all relevant times hereto, has been an employer within the State of California, who regularly employed more than five persons, including Plaintiff.

9. Defendant Brian Addington is an individual whose residence is located in the State of California. Defendant is presently the Chief of Pittsburg Police Department, and, as a result, was a supervisor and/or managerial employee of Defendant City of Pittsburg.  For purposes of the cause of action under the Civil Rights Act, Defendant Addington is being sued in his official and/or individual capacity acting under color of law.

10. Defendant Michael Perry is an individual whose residence is located in the State of California. Defendant is presently a Captain with the Pittsburgh Police Department, and, as a result, was a supervisor and/or managerial employee of Defendant City of Pittsburg.  For purposes of the cause of action under the Civil Rights Act, Defendant Perry is being sued in his official and/or individual capacity acting under color of law.

11. Plaintiff is informed and believes, and on that basis alleges, Defendant City of Pittsburg, at all applicable times, received and continues to receive federal funds based upon maintaining a certain level of crime solving statistics that it reports to the Federal Bureau of Investigation as well as other federal agencies.

12. Plaintiff does not know the true names and capacities of Defendants sued herein as DOES 1 through 25, and therefore sues these Defendants by fictitious names. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to, and that Plaintiff's injuries and damages as set forth were proximately caused by said defendants. Plaintiff will amend this complaint to state the true names and capacities when ascertained.

13. Plaintiff is informed and believes, and thereby alleges that each of the Defendants, herein were at all times relevant hereto, the agents, representatives, servants and employees of the remaining Defendants, and were acting at least in part within the course and scope of such relationship, and that the wrongful acts alleged herein were committed by such Defendants, and each of them. Further, Plaintiff is informed and believes that Defendants were, at all relevant times, one integrated enterprise and/or employer.

### III.     JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1331, in that Plaintiff is asserting federal claims, Defendant employed Plaintiff in California and regularly conducts business in California.

15. Venue is proper in the Northern District of California in that Plaintiff was employed by Defendant in this judicial district, Plaintiff's supervisors were headquartered in this judicial district, and Defendant's unlawful conduct was directed from, and carried out in its offices in this judicial district.

### IV.     FACTUAL BACKGROUND

16. After graduating from the police academy, Plaintiff began his law enforcement career as a Contra Costa County Deputy Sheriff. From 2007 through 2012, he developed his police skills and gained valuable experience on patrol, responding to calls, conducting investigations, making and documenting arrests, completing incident reports, and working with the public and fellow officers.

17. In September 2012, Defendant City of Pittsburg hired Plaintiff as a Police Officer I. As part of his employment, Plaintiff performed his duties and responsibilities in a professional

manner. He received positive performance evaluations and commendations for his investigative skills, and was recognized for demonstrating composure under stressful conditions, as well as using sound officer safety tactics. At all relevant times, he possessed the requisite skills in his position and was capable of performing the essential functions of his job.

18. Plaintiff completed his probation period with City of Pittsburg and, as a result, had a protected property interest in his employment, including a legitimate expectancy of continuation of public employment. At all relevant times, Plaintiff held peace officer status pursuant to Penal Code section 830.1 and, as such, was entitled to the rights and protections afforded pursuant to the Public Safety Officers' Procedural Bill of Rights Act ("POBR"), Government Code section 3300 et. seq.

### A. Plaintiff complains about Pittsburg's policy of downgrading and burying crimes.

19. As Plaintiff began his employment with City of Pittsburg, he learned that its police department had a significantly less stringent policy on documenting incidents, completing reports, and assigning violations than he had experienced while employed as a deputy sheriff for Contra Costa County. For example, during training sessions, his supervisors instructed him and his fellow officers not to assign a felony to a crime unless an arrest had been made, and, preferably, witnesses were readily available and willing to testify to confirm a crime. Further, Plaintiff and his co-officers were told to discount felonies to misdemeanors, particularly if they could be categorized as a "wobbler" (felony or misdemeanor), or to classify the crime as a "suspicious circumstance." Defendant, by mandating these lesser crime classifications and instructing officers to redact incident reports, artificially spiked its department's crime solving rate, misrepresented the City of Pittsburg's safety, and fraudulently received federal funds.

20. Plaintiff questioned and complained about Defendant's crime reporting standards during his morning training sessions. In one training session, Plaintiff complained about the Department's policy of downgrading felony crimes to misdemeanors or classifying crimes as "suspicious circumstances." He explained to his training officer that when he was employed as a deputy sheriff in Contra Costa County he did not submit or alter incident reports based on what could, or could not, be proven at the time the crime was committed. Plaintiff's training officer

replied that the Pittsburg Police Department also avoided paying booking fees by not bringing in suspects with charges that might not result in a felony conviction. Plaintiff further complained that Defendant's policy was frustrating because "field releasing" suspects typically resulted in extra time incurred in issuing a warrant and relocating the suspect. Meanwhile, many suspects were prone to flee or commit another crime. Plaintiff's training officers responded, "That's the way we do business. Don't complain."

21. Plaintiff reported Defendant's pattern and practice of discounting serious crimes and falsely labeling certain felonies as "suspicious circumstances" to members of another government agency, the Contra Costa County Sheriff's Department, on multiple occasions, verbally and with computer messaging (i.e., Mobile Dispatch Computer). Plaintiff discussed with deputy sheriffs the distinctions between Pittsburg's police department and Contra Costa County such as Defendant's emphasis on not documenting the use of force by an officer, and how crimes were wrongly classified by Defendant, and how Plaintiff did not agree certain felonies should be classified as misdemeanors so that Defendant's department did not have to conduct a follow up investigation. Defendant, including Plaintiff's supervisors, knew Plaintiff reported these complaints to the Contra Costa County Sheriff's Department because they had access to Plaintiff's messages which were transmitted through the same radio frequency and they reviewed them throughout his employment.

**B.  Plaintiff complains of Captain Perry's misuse of police resources.**

22. In the fall of 2013, Plaintiff also complained about Defendant's use of resources for addressing crime. Two officers from the Street Crimes Unit (SCU) were assigned to work a graveyard shift at a pest control business in Plaintiff's assigned beat on East Leland Road. Plaintiff was working the graveyard shift on patrol that same week. His supervisor, Sergeant William Hatcher, advised patrol officers during pre-shift meetings to avoid the area unless they were dispatched there.

23. Since the pest control business was in Plaintiff's assigned beat, he asked Sergeant Hatcher, privately, for details. Sergeant Hatcher informed him that the business had been getting vandalized and gasoline was being siphoned from the vehicles parked inside the locked gate.

1  Sergeant Hatcher said the SCU officers were given keys to the business to sit inside the building
2  and survey the parking lot in an attempt to catch the persons responsible for these misdemeanor
3  crimes.  Plaintiff told Sergeant Hatcher that he was unaware of any crimes occurring at this
4  location and there were no recent calls for this business.  He also asked Sergeant Hatcher why the
5  Street Crimes Unit would be employed for surveillance on misdemeanor crimes when patrol
6  officers were available to make routine area checks or conduct similar surveillance.  Sergeant
7  Hatcher replied that the business owner was reporting the crimes directly to Captain Michael
8  Perry, which is why there were no recent dispatched calls for service.  Sergeant Hatcher added
9  that Captain Perry assigned the Street Crimes Unit to the detail, owned property in the area, and
10 had a vested real estate interest in this property.  Plaintiff complained to Sergeant Hatcher about
11 this use of resources and said he did not agree that using the SCU for a full week on the pest
12 control business was justified when other business within the City of Pittsburg suffered frequent
13 crimes but did not receive the same level of police service and attention.  Sergeant Hatcher
14 responded that the decision to assign SCU was "above his pay grade."

15        **C.    <u>Captain Perry's daughter is assigned to "ride along" with Plaintiff.</u>**

16        24.    In December 2013, a few weeks after Plaintiff complained about using SCU for
17 the pest control business, Captain Michael Perry's adult daughter was assigned to a ride along in
18 Plaintiff's vehicle.  She was not a police officer and was not employed by the police department.
19 There were four other officers available for a ride along during this shift.  Captain Perry's
20 daughter had never been assigned to a previous ride along with Plaintiff.  During the shift, she
21 probed Plaintiff as to whether he enjoyed working for the Pittsburg Police Department and
22 whether he liked her father, Captain Perry.  Plaintiff was uncomfortable having her ride with him
23 and felt as if she was reporting to her father.  He voiced his concerns to Sergeant Hatcher.

24        **D.    <u>Plaintiff continues to complain about Defendant's policy of downgrading
25              crimes.</u>**

26        25.    In late 2013, Plaintiff investigated a shooting into a house in which a young girl
27 was sleeping.  Plaintiff was unable to locate any eye witnesses to the shooting.  After interviewing
28 the family in the house, he began to document the crime as a felony for shooting into an occupied

1  dwelling under Penal Code section 246.  But, when he turned in his incident report, his
2  supervisor, Sergeant Brian Mathews, instructed him to redact his report and write it as a
3  "negligent discharge of a firearm" under Penal Code section 246.3.  His supervisor explained,
4  "The detectives aren't going to follow up on this.  You're going to write it as a misdemeanor."
5  Plaintiff edited his report accordingly.

   E.   **Plaintiff's report to an outside agency results in an arrest of a violent gang leader.**

   26.   In late March/early April of 2014, Plaintiff attempted to locate a suspect, "Ricky J.", who was wanted for questioning in a shooting the occurred in Pinole.  He had an outstanding warrant for his arrest for assaulting a police officer in Antioch.  Plaintiff learned from an informant that Ricky J was staying at a criminal safe house in Pittsburg.  When he approached Sergeant Hatcher and two detectives with this information, they told him the Pittsburgh Police Department would not be using their resources to locate and arrest Ricky J. because none of the crimes he was connected to occurred in Pittsburg.

   27.   A few weeks later, Ricky J. was identified as the lead suspect several days after a shooting and attempted murder which occurred on the morning of April 28, 2014 in Pittsburg.  Plaintiff complained to Sergeant Hatcher and the detectives that this shooting could have been prevented if the leads Plaintiff developed were investigated further, instead of ignored by their Department.  One of the detectives responded by telling Plaintiff to stay out of the investigation and not to contact Plaintiff's informant who provided Ricky J.'s whereabouts.

   28.   In early May 2014, on patrol, Officer Beth Terwilliger arrested a female driving a stolen vehicle.  The female suspect volunteered information on the location of Ricky J., and knew he was wanted by the Pittsburg police department for the April 2014 shooting.  Plaintiff and Ingram were able to confirm Ricky J.'s location at a local motel, but, did not inform the Pittsburg detectives as they were requested to stay out of the investigation.  Plaintiff did share the information with a Sergeant and a Deputy from Contra Costa Sheriff's Department, through patrol car computer messages, text messages, and in person.  Plaintiff knew that Ricky J was a member of a gang known as "FAIM" or "Family Affiliated Irish Mafia", and the Sergeant had

experience investigating this gang. FAIM was formed in Rodeo in the 1990s with members known to reside in Bay Point, Pittsburg, and Antioch. Plaintiff passed along Ricky J.'s location so that the Deputies might be able to arrest him and remove a violent criminal from the public streets.

29. On May 14, 2014, Sheriff Deputies located Ricky J. in Bay Point and pursued him through Pittsburg and into Antioch were they eventually took him into custody. Patrol car messages concerning Ricky J.'s whereabouts were transmitted between Plaintiff and the Sheriffs' department during this night.

### F. Defendant ordered Plaintiff to redact his incident reports to omit references to using force.

30. Throughout Plaintiff's employment, the Pittsburg Police Department, through its training officers and supervisors, directed Plaintiff and his co-officers not to report incidents where they employed force even if force was reasonable and necessary to take a suspect into custody and was consistent with police protocol.

31. On April 19, 2014, Plaintiff arrived near Gladstone Drive in Pittsburg where a fellow officer was struggling with a suspect who was resisting arrest. Sergeant Brian Matthews also arrived at the scene. The suspect continued to struggle with the officer despite receiving multiple commands to back down. Plaintiff assisted the officer by striking the suspect once behind the knees with his flashlight to restrain the suspect. Plaintiff's use of force was consistent with police department protocol for employing reasonable force to subdue a suspect in this situation. A second officer arrived on the scene a few minutes later, and in full view of Sergeant Matthews, smashed the suspect's face into a car door while the restrained suspect was sitting on the ground shouting at the officers. Plaintiff did not believe the second officer's use of force was justified.

32. When Plaintiff completed his report for this incident he described using his flashlight to subdue the suspect. Sergeant Hatcher reviewed his report and told Plaintiff to redact the reference to Plaintiff's flashlight and, instead, state that Plaintiff simply wrestled the suspect to the ground. Sergeant Hatcher further instructed Plaintiff to remove any mention of the

1  flashlight and omit any mention of the suspect's facial injuries caused by the second officer.
2  Sergeant Hatcher crossed out the lines in Plaintiff's draft report which referred to the flashlight
3  and added notes of his own.  Plaintiff followed with Sergeant Hatcher's instructions, adopted
4  Sergeant Hatcher's notes, and redacted the reference to any use of force during this event.

5        33.      On April 27, 2014, Plaintiff backed up on Officer Terwilliger's detention of a
6  vehicle at the Meadows Mobile Home Park in Pittsburg.  The vehicle contained four male
7  individuals in gang affiliated clothing.  As Officer Terwilliger, the primary officer, questioned
8  one of the suspects in the car, she observed what she believed to be a black berretta hand gun
9  between the driver's seat and door sill.  Officer Terwilliger yelled, "Gun! Gun!" and demanded
10 that the driver exit the car.  While the suspect exited the car, he tried to flee and began wrestling
11 with Officer Terwilliger.  They toppled to the ground where officer Terwilliger managed to secure
12 the suspect's upper body to the ground such that his right arm was pinned underneath.  He
13 continued to resist apprehension and flailed his legs about trying to get into a kneeling position.
14 Plaintiff arrived upon Officer Terwilliger and the suspect in this position.  Unable to see the
15 suspect's right hand and after just hearing Officer Terwilliger yell, "Gun! Gun!", he believed the
16 suspect was going for a gun while trying to get leverage on Officer Terwilliger.  Therefore, in
17 accordance with Department protocol for exercising reasonable force in defense of a third person,
18 Plaintiff struck the suspect on the right upper arm with his flashlight to gain compliance.
19 Plaintiff's supervisor, Sergeant Hatcher, and several other officers arrived on the scene.  Upon
20 further inspection, the perceived handgun was discovered to be a replica of a berretta handgun
21 (BB gun with orange tip removed).

22       34.      Sergeant Hatcher determined that no crime would be documented and the suspect
23 was not going to be arrested.  Sergeant Hatcher told Officer Terwilliger not to arrest anyone for
24 obstructing or resisting an officer or being in possession of a replica firearm, and to remove the
25 handcuffs and release the suspect.  He directed Officer Terwilliger to take possession of the BB
26 gun and record it only as a "found property."  Sergeant Hatcher ordered Plaintiff not to document
27 anything in relation to this incident, and to clear the scene and respond to other calls.
28

35. That same evening, Plaintiff received calls and MDC messages from a Contra Costa County deputy sheriff who learned of his struggle and asked Plaintiff what happened. Plaintiff described the incident and told him that he needed to use his flashlight to subdue a suspect and protect another officer. Plaintiff referred to the restraint as "flashlight therapy", a slang phrase for use of reasonable and justified force. Another officer with the City of Pittsburg referred to Plaintiff's struggle as "flashlight work."

36. Pittsburg police officers and supervisors discussed these two "flashlight" incidents in pre-shift briefings several weeks later. They joked and shared their own stories regarding use of force or similar incidents. None of these officers had been disciplined or even warned about using their flashlights to subdue suspects.

37. Plaintiff continued to meet with members and supervisors of the Contra Costa County Sheriff's Department and played softball together. They frequently discussed the crime classification differences between the cities' two law enforcement agencies. Plaintiff noted how common it was for supervisors from the City of Pittsburg Police Department to insist that forceful arrests <u>not</u> be documented, that felony crimes be classified as misdemeanors to give the false appearance that Pittsburg was a safer community, and that follow up investigations were discouraged.

### G. **Plaintiff is placed on Administrative Leave.**

38. On June 18, 2014, Plaintiff appeared for his shift and was handed a memorandum informing him that he was being placed on Administrative Leave and an Internal Affairs investigation would commence. Plaintiff was not provided any reason other than, "This concerns an incident at Meadows's Mobile Home Park." No specifics were given. Plaintiff's gun and badge were taken. He was escorted out of the building to his car in the parking lot and told not to have any contact with anyone in the Department.

39. Officer Terwilliger, who had started her employment on the same date as Plaintiff, and joined him on numerous calls and investigations, was also placed on Administrative Leave on June 18, 2014, before her shift began.

40.     Officer Terwilliger was interviewed, a few days later, regarding the Mobile Meadows mobile home park apprehension. When discussing the omission in the incident report of the flashlight and force used to subdue the suspect, Officer Terwilliger was pressured by Defendants to take the position that she did not include this information because she thought Plaintiff would include it in his report. Union President Chuck Blazer explained that Officer Terwilliger's best course of action was not to expose Sergeant Hatcher, rather, to blame Plaintiff by contending she did not know Plaintiff used force and thought Plaintiff would mention the incident in his report. Officer Terwilliger explained that she had refused to fabricate the report because she knew that Sergeant Hatcher had specifically ordered both of them not to document the use of flashlight or force in their reports. She insisted, "I'm not going to lie." Officer Terwilliger was subsequently forced to resign.

### H.     **Defendant threatens Plaintiff with criminal charges and constructively discharges him.**

41.     On or about July 29, 2014, Defendants informed Plaintiff that they requested a criminal investigation and were asking the District Attorney's Office to pursue criminal charges against him. They did not advise him of any specific allegations or charges he had allegedly committed, in direct violation of the Public Safety Officers Procedural Bill of Rights. Neither officer was interviewed as part of the Internal Affairs investigation or given a copy of an Internal Affairs report.

42.     Instead, Defendant advised Plaintiff that he had two options: (1) Fight the "alleged misconduct" charge and he would be terminated and criminal charges would be filed; or (2) Resign immediately with no criminal charges and the Internal Affairs investigative report would be "buried." Plaintiff felt intimidated and coerced and viewed the working conditions as intolerable. He was concerned that Defendant City of Pittsburg would follow through with its threat of criminal prosecution. He believed Defendant was capable and willing to fabricate events to destroy Plaintiff's career and he was concerned about the affect a criminal prosecution, however baseless, would have on his family's name in the community. At this point, Plaintiff understood he had no other choice but to quit. Accordingly, on or about August 4, 2014, he

signed a resignation letter under duress and was constructively terminated for false, inconsistent, and untrustworthy reasons. Officer Terwilliger was also constructively terminated on August 4 in the same manner.

**I.     Defendant sabotages Plaintiff's job prospects and reputation after terminating him.**

43.     Since Plaintiff's termination, he has reasonably and diligently sought comparable employment with multiple law enforcement agencies. Plaintiff has told background investigators about the incident reports Defendant asked him to fabricate and passed polygraph examinations during interviews. However, Defendant has obstructed Plaintiff's efforts to obtain gainful employment, particularly, when investigators for prospective employers approached Defendant for background checks. Defendant has published false information about Plaintiff, including false accusations that he was terminated for "alleged misconduct" or suspected of "criminal activity" without providing investigators from prospective employers with an Internal Affairs report or crime report. Consequently, Plaintiff has not received offers of employment.

44.     On January 25, 2015, Plaintiff wrote Chief Brian Addington of the Pittsburg Police Department, explaining the difficulties he was experiencing in his hiring process. Plaintiff noted that background investigators were receiving inaccurate information from Defendant about Plaintiff which was preventing employment. Plaintiff asked Chief Addington to disclose to him the information the department was sharing with prospective employers. No response was forthcoming. Given the allegations of "alleged misconduct" against Plaintiff, his career in law enforcement is over.

**J.     An Internal Affairs report does exist, which Defendant still refuses to disclose.**

45.     Even though Plaintiff is no longer employed with the City of Pittsburg's Police Department, he has diligently served Defendant by responding to subpoenas and testifying in cases he was involved in during his employment as a police officer. During criminal trials it is common for a defendant, through his or her attorney, to file a <u>Pitchess</u> motion to request the production of an arresting officer's personnel file where the defendant believes the officer's use

of force or his/her credibility is at issue in the case. <u>Pitchess</u> motions were filed in a number of trials in which Plaintiff testified after his termination without any consequence to Plaintiff.

46. In October of 2015, a murder case Plaintiff had investigated was approaching trial. A <u>Pitchess</u> motion was filed and the court was provided with a large internal investigation file pertaining to Plaintiff. Plaintiff was informed that the file contained results of an Internal Affairs investigation pertaining to him. This was the first time that Plaintiff learned that Defendant had completed an Internal Affairs report and included it in his employment file. However, he still was not provided a copy of the report and, thus, was unable to review any of the allegations contained within. Plaintiff explained to the Deputy District Attorney that the Pittsburg Police Department had threatened him with criminal charges if he did not resign and he did not feel comfortable testifying in any more of their cases. Accordingly, Plaintiff was assigned a public defender and pled the 5th Amendment to avoid responding to questions regarding unknown and unsubstantiated allegations. Unfortunately, Defendant's actions, which led to Plaintiff pleading the 5th Amendment for his own protection, cast Plaintiff in a negative and false light, defamed him professionally and personally, and have destroyed his ability to obtain gainful and comparable employment in law enforcement.

**FIRST CAUSE OF ACTION**
**RETALIATION FOR DISCLOSING FALSE CLAIMS [FEDERAL LAW]**
**(Violation of Federal False Claims Act, 31 U.S.C. § 3730(h))**
**(v. Defendant City of Pittsburg)**

47. Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

48. The Federal False Claims Act prohibits an employer from discharging, threatening, harassing, or otherwise discriminating against an employee in the terms and conditions of employment because of lawful acts undertaken by the employee in furtherance of an action under the Act or other efforts to stop one or more violations of this subchapter. Furtherance of an action under the Act includes actions to disclose to the government/law enforcement agency false claims and to participate in/act in furtherance of the investigation of such.

49. Plaintiff is informed and believes, and on that basis alleges, Defendant City of Pittsburg, at all applicable times, received and continues to receive federal funds based upon maintaining a certain level of crime solving statistics that it reports to the Federal Bureau of Investigation as well as other federal agencies.

50. As alleged herein, Plaintiff reported to government agencies, including the Contra Costa County Sheriff's Department that Defendant City of Pittsburg Police Department's various employees were engaged in the Department's policy of misrepresenting criminal statistics to the Federal Bureau of Investigation, other federal agencies, and the general public. Plaintiff reported that this long standing policy included downgrading felony crimes to misdemeanors, falsely classifying crimes as "suspicious circumstances", instructing officers to alter their incident reports to omit references to use of force, and misusing police resources.

51. Under 31 U.S.C. § 3730(h), Defendants, jointly and/or severally are liable for all relief necessary to make Plaintiff whole, including reinstatement or front pay, two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the retaliation, plus litigation costs and reasonable attorneys' fees.

52. The individual Defendants did the acts alleged herein maliciously, fraudulently, and oppressively, and/or with the wrongful intention of injuring Plaintiff, and/or with conscious disregard of the rights of Plaintiff, and/or with an improper and evil motive amounting to malice thus entitling Plaintiff to punitive damages against the individuals Defendants.

**SECOND CAUSE OF ACTION**
**(Violation of 42 U.S.C. §1983)**
**(All Defendants)**

53. Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further alleges as follows.

54. In acting above, Defendant violated Plaintiff's due process, speech, and petition rights under the First and Fourteenth Amendments to the United States Constitution, and, acting under color of authority, further violated Plaintiff's rights under 42 U.S.C. § 1983.

55. Defendants violated Plaintiff's First Amendment rights in that they retaliated against Plaintiff for making complaints of public concern to deputies from the Contra Costa

County Sheriff's Department, Pittsburg Police Department, and outside government agencies, and constructively terminated Plaintiff as a result of his complaints and reports about Defendant's policies of (a) fabricating crime statistics to the Federal Bureau of Investigation and general public; (b) instructing rank and file officers to alter and redact their incident reports; (c) not investigating or pursuing crimes in its district; and (d) misusing police resources.

56.   Defendants violated Plaintiff's Fourteenth Amendment due process rights, in that they constructively discharged him without due process of the law.  Defendants failed to provide Plaintiff with notice and an opportunity to respond to any alleged misconduct prior to his discharge, through a liberty interest hearing or other forum.  Further, Defendants violated Plaintiff's due process rights by threatening and intimidating Plaintiff to force him to resign his employment and by failing to conduct their own independent, fair, and impartial investigation of the matter.  In addition, Defendants violated Plaintiff's due process rights when they deprived him of a liberty interest without due process because of the stigmatizing manner in which he was terminated.  Plaintiff was forced to resign as a result of duress, coercion, threats, and intimidation for reasons that were false, publicized, and stigmatizing to his standing or reputation in his community.  Further, Plaintiff has been denied other employment opportunities as a result of this stigma.

57.   Plaintiff is informed and believes that Defendant City of Pittsburg has a long-standing and pervasive custom, policy, pattern, and well settled practice of retaliating against employees who make complaints of public concern.  Defendant City of Pittsburg is a moving force behind this policy and custom.

58.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered loss of employment, indignity, great humiliation and emotional distress manifesting in physical symptoms.

59.   Defendants' actions have caused and continue to cause Plaintiff substantial losses in earnings, significant reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to his damage in an amount according to proof.

60. The acts of the individual defendants, Chief Brian Addington and Captain Michael Perry, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure Plaintiff and to cause Plaintiff mental anguish, anxiety, and distress. Defendants' acts were done in conscious disregard of the risk of severe emotional harm to plaintiff and with the intent to injure plaintiff, constituting oppression, fraud, malice under California Civil Code §3294, entitling Plaintiff to punitive damages as to the individual defendants.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants, and each of them as follows:

1. That Defendants are found to have violated the above-referenced provisions of the Federal False Claims Act 31 U.S.C. § 3730(h) and 42 U.S.C. § 1983 as to Plaintiff;

2. That Defendants are required to pay compensatory damages, including but not limited to two times the amount of back pay, front pay, interest on back pay, pre-judgment and post-judgment interest, and damages for emotional pain and suffering due to retaliation inflicted upon Plaintiff, among other relief;

3. That the individual Defendants are required to pay Plaintiff punitive damages for their malicious, reckless or callous indifference to the rights of Plaintiff;

4. For equitable and/or injunctive relief, including reinstatement, according to proof;

5. That Plaintiff receives an award of reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(h), 42 U.S.C. § 1983, and Code of Civil Procedure § 1021.5, as well as any other applicable statute;

6. That the Court order further relief, in law or equity, as it deems appropriate and just.

17
MICHAEL SIBBETT, JR. v. CITY OF PITTSBURG, ET AL.
COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: August 3, 2016                BROWN POORE LLP


By:     /s/ Scott Brown
        Scott A. Brown
        Attorneys for Plaintiff